# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SPORTS AUTHORITY HOLDINGS, INC., *et al.*,[1] | Case No. 16-10527 (MFW) |
| Debtors. | Jointly Administered |
| | |
| TSA STORES, INC., TSA PONCE, INC., and TSA CARIBE, INC., | |
| Plaintiffs, | |
| v. | Adversary Proceeding No. 16-50360 (MFW) |
| PINNACLE SPORTS EQUIPMENT INC., | |
| Defendant. | |

## PLAINTIFFS' (I) OBJECTION TO DEFENDANT PINNACLE SPORT EQUIPMENT INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND (II) CROSS-MOTION FOR SUMMARY JUDGMENT

GIBSON, DUNN & CRUTCHER LLP
Robert A. Klyman
David A. Battaglia
Sabina Jacobs
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Michael R. Nestor (No. 3526)
Michael S. Neiburg (No. 5275)
Andrew L. Magaziner (No. 5426)
Rodney Square, 1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600

*Counsel for Plaintiffs*

Dated:  May 16, 2016

---

[1]   The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Sports Authority Holdings, Inc. (9008); Slap Shot Holdings Corp. (8209); The Sports Authority, Inc. (2802); TSA Stores, Inc. (1120); TSA Gift Card, Inc. (1918); TSA Ponce, Inc. (4817); and TSA Caribe, Inc. (5664).  The headquarters for the above-captioned Debtors is located at 1050 West Hampden Avenue, Englewood, Colorado 80110.

# TABLE OF CONTENTS

**Page**

I.   LEGAL STANDARD FOR SUMMARY JUDGMENT ..................................................... 2

II.  OBJECTION TO DEFENDANT'S MOTION ................................................................. 4

    A.   Summary of Argument in Support of Objection to Motion.................................... 4

    B.   The Motion Should be Denied Because It Rests on Disputed Material Facts. ........ 5

        1.   Defendant Has Not Established That the Vendor Agreement Was
             Terminated. ............................................................................................... 5

        2.   Defendant Admitted That It Has a Consignment – Not a Bailment –
             Arrangement with Plaintiffs...................................................................... 6

        3.   Even If the Vendor Agreement Were Terminated, Termination Does Not
             Entitle Defendant to the Return of the Consigned Goods........................... 7

    C.   Defendant Is Not Entitled to Summary Judgment That Plaintiffs Are Bailees or
        That Consigned Goods Are Not Property of Plaintiffs' Estates Because the
        Undisputed Material Facts Demonstrate That Plaintiffs and Defendant Agreed to a
        Consignment Arrangement and That Defendant's Interest in Consigned Goods Is
        Subordinate to the Interests of Plaintiffs' Secured Lenders and to Plaintiffs'
        Interests as Debtors in Possession.................................................................. 8

        1.   The Arrangement Between Plaintiffs and Defendant Is Not a Bailment.... 8

        2.   The Arrangement Between Plaintiffs and Defendant Is a Consignment. . 11

        3.   The Consignment Arrangement Entitles Defendant to Only a Purchase
             Money Security Interest in the Consigned Goods. ................................... 14

        4.   As a Consignor That Failed to Obtain Priority, Defendant's Interest Is
             Subordinate to the Interests of Plaintiffs' Secured Lenders..................... 14

        5.   Defendant Has Not Successfully Prosecuted – and Cannot Successfully
             Prosecute – a Reclamation Demand. ....................................................... 19

III. PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT ............................. 21

    A.   Summary of Argument in Support of Cross-Motion ........................................... 21

    B.   Plaintiffs Are Entitled to Summary Judgment That Defendant's Security Interest
        Is Subordinate to the Prior Perfected Security Interests of Plaintiffs' Secured
        Lenders............................................................................................................ 21

        a.   Article 9 of the UCC Governs the Vendor Agreement................. 22

# TABLE OF CONTENTS
## (cont'd)

b.    The Vendor Agreement Is a Contract for Sale Under Article 2. .. 24

c.    UCC Article 2 Converts a Retention of Title in Goods Shipped or Delivered to a Reservation of a Security Interest in Such Goods. 25

d.    Defendant Is Entitled to Only a Purchase Money Security Interest in the Consigned Goods. ............................................................. 26

e.    Defendant's Security Interest is Subordinate to the Prior Perfected Security Interests of the Secured Lenders. ................................... 26

C.    Plaintiffs Are Entitled to Summary Judgment That Plaintiffs Have an Interest in the Consigned Goods That Is Superior to Defendant's Interest in the Consigned Goods. ......................................................................................................... 31

1.    Defendant's UCC-1 Financing Statement Is an Avoidable and Recoverable Preferential Transfer Under Sections 547(b) and 550 of the Bankruptcy Code. ...................................................................... 32

a.    The Lien Transfer Was a Transfer of Plaintiffs' Interest in Property to or for the Benefit of a Creditor. ................................................. 32

b.    The Lien Transfer Was Made for or on Account of an Antecedent Debt Owed by Plaintiffs Before the Lien Transfer Was Made. ..... 34

c.    The Lien Transfer Was Made While Plaintiffs Were Presumptively Insolvent Under Section 547(f) of the Bankruptcy Code. ............ 35

d.    The Lien Transfer Was Made Within 90 Days Prior to the Petition Date. ........................................................................................... 35

e.    The Lien Transfer Enables Defendant to Receive More Than It Would Receive in Plaintiffs' Chapter 7 Liquidation. ................... 35

2.    Upon Avoidance and Recovery Under Sections 547 and 550, Defendant's Unperfected Security Interest Is Avoidable and Recoverable Under Sections 544(a) and 550 of the Bankruptcy Code Rendering the Consigned Goods Property of Plaintiffs' Estates. ...................................................... 38

IV.    CONCLUSION ............................................................................................. 40

# TABLE OF AUTHORITIES

Page

## Cases

*In re AFA Inv. Inc.*,
  No. 12-11127, 2016 WL 908212 (Bankr. D. Del. Mar. 9, 2016) ....................................36, 37

*Allegiance Health Care Corp. v. Primary Health Sys., Inc. (In re Primary Health Sys.)*,
  258 B.R. 111 (Bankr. D. Del. 2001) ...................................................................................20

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).............................................................................................................3

*Braunstein v. Karger (In re Melon Produce, Inc.)*,
  976 F.2d 71 (1st Cir. 1992)................................................................................................33

*Burtch v. Detroit Forming, Inc. (In re Archway Cookies)*,
  435 B.R. 234 (Bankr. D. Del. 2010) .................................................................................2, 3

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).............................................................................................................2

*In re Child World*,
  145 B.R. 5 (Bankr. S.D.N.Y. 1992)....................................................................................20

*In re Circuit City Stores, Inc.*,
  441 B.R. 496 (Bankr. E.D. Va. 2010) ................................................................................19

*In re Classic Drywall, Inc.*,
  127 B.R. 874 (D. Kan. 1991)..............................................................................................32

*Glenshaw Glass Co. v. Ontario Grape Growers' Marketing Bd.*,
  67 F.3d 470 (3d Cir. 1995)................................................................................................8, 9

*In re Greenline Equip., Inc.*,
  390 B.R. 576 (Bankr. N.D. Miss. 2008) ..............................................................................9

*In re Klingbeil*,
  119 B.R. 178 (Bankr. D. Minn. 1990) ...............................................................................33

*Lavonia Mfg. Co. v. Emery Corp.*,
  52 B.R. 944 (E.D. Pa. 1985) ..............................................................................................20

*Leonard v. General Motors Corp. (In re Headquarters Dodge)*,
  13 F.3d 674 (3d Cir. 1993)..................................................................................................3

# TABLE OF AUTHORITIES
## (cont'd)

Page

*Liquidating Trust of U.S. Wireless Corp., Inc. v. Huffman (In re U.S. Wireless Corp., Inc.)*,
  386 B.R. 556 (Bankr. D. Del. 2008) ........................................................................3

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ....................................................................................................3

*Mystic Color Lab, Inc. v. Auctions Worldwide, LLC*,
  934 A.2d 227 (Conn. 2007) ........................................................................................9

*Payberg v. Harris*,
  931 P.2d 544 (Colo. App. 1996) .................................................................................9

*In re Phillips*,
  24 B.R. 712 (Bankr. E.D. Cal. 1982) ........................................................................33

*In re Qualia Clinical Serv., Inc.*,
  652 F.3d 933 (8th Cir. 2011) ....................................................................................33

*Simon & Schuster, Inc. v. Advanced Mktg. Servs. (In re Advanced Mktg. Servs.)*,
  360 B.R. 421 (Bankr. D. Del. 2007) ........................................................................20

*Stanziale v. S. Steel & Supply, L.L.C. (In re Conex Holdings, LLC)*,
  518 B.R. 269 (Bankr. D. Del. 2014) ........................................................................34

*Tire Kings of Am., Inc. v. Hoffman Tire Co. (In re Tire Kings of Am., Inc.)*,
  164 B.R. 40 (Bankr. M.D. Pa. 1993) ........................................................................36

*In re Total Tech. Serv., Inc.*,
  150 B.R. 893 (Bankr. D. Del. 1993) ........................................................................36

*In re Tristar Automotive Group, Inc.*,
  141 B.R. 41 (Bankr. S.D.N.Y. 1992) ........................................................................39

*In re Tronox Inc.*,
  464 B.R. 606 (Bankr. S.D.N.Y. 2012) ......................................................................32

*United States v. Jamas Day Care Ctr. Corp.*,
  152 Fed. App'x 171 (3d Cir. 2005) ............................................................................3

*United States v. Nektalov*,
  440 F. Supp. 2d 287 (S.D.N.Y. 2006) ......................................................................12

# TABLE OF AUTHORITIES
## (cont'd)

Page

*In re Valley Media, Inc.*,
  279 B.R. 105 (Bankr. D. Del. 2002) ..................................................13, 17, 18, 23, 29, 30, 39

*In re Vaso Active Pharm., Inc.*,
  500 B.R. 384 (Bankr. D. Del. 2013), *aff'd*, 537 B.R. 182 (D. Del. 2015).........................36, 37

**Statutes**

11 U.S.C. § 101(10)(A)..................................................................................................................33

11 U.S.C. § 101(54).......................................................................................................................32

11 U.S.C. § 506(c).........................................................................................................................37

11 U.S.C. § 541(a).........................................................................................................................39

11 U.S.C. § 544........................................................................................................................35, 39

11 U.S.C. § 544(a).........................................................................................................1, 31, 38, 39

11 U.S.C. § 544(a)(1)................................................................................................................38, 39

11 U.S.C. § 546(c)....................................................................................................................19, 20

11 U.S.C. § 547..............................................................................................................................38

11 U.S.C. § 547(a).........................................................................................................................39

11 U.S.C. § 547(b) ....................................................................1, 16, 29, 31, 32, 33, 34, 35, 38

11 U.S.C. § 547(b)(5)...............................................................................................................36, 37

11 U.S.C. § 547(e)(2)....................................................................................................................35

11 U.S.C. § 547(f)..........................................................................................................................35

11 U.S.C. § 550................................................................................................1, 31, 32, 35, 38, 39

11 U.S.C. § 550(a).........................................................................................................................32

11 U.S.C. § 1107(a)..................................................................................................................38, 39

11 U.S.C. § 546(c)(1).....................................................................................................................19

U.C.C. § 1-201(35).........................................................................................................................25

# TABLE OF AUTHORITIES
## (cont'd)

**Page**

U.C.C. § 2–326(3) .................................................................................................12, 23

U.C.C. § 2-103(1) ......................................................................................................24

U.C.C. § 2-103(1)(a), (d) ...........................................................................................24

U.C.C. § 2-104(1) ................................................................................................12, 23

U.C.C. § 2-106(1) ......................................................................................................24

U.C.C. § 2-326 ...........................................................................................................16

U.C.C. § 2-326(1) ................................................................................................16, 28

U.C.C. § 2-326(2) ................................................................................................16, 28

U.C.C. § 2-326(a) ................................................................................................16, 28

U.C.C. § 2-401 ...............................................................................................24, 25, 26

U.C.C. § 2-401(1) ......................................................................................................25

U.C.C. § 2-702 ....................................................................................................19, 20

U.C.C. § 2-702(3) ......................................................................................................20

U.C.C. § 9-102 ...........................................................................6, 11, 12, 21, 22, 23

U.C.C. § 9-102(20) ....................................................................................................22

U.C.C. § 9-102(a)(20) ...............................................................................................12

U.C.C. § 9-102(a)(23) .........................................................................................13, 23

U.C.C. § 9-103 ....................................................................................................14, 26

U.C.C. § 9-103(d) ......................................................................................................14

U.C.C. § 9-109(a)(6) .................................................................................................26

U.C.C. § 9-109, cmt. 6 .......................................................................................15, 27

U.C.C. § 9-201 ...........................................................................................................24

U.C.C. § 9-317 ...........................................................................................14, 15, 26, 27

# TABLE OF AUTHORITIES
## (cont'd)

**Page**

U.C.C.  § 9-317(a)(1) ........................................................................................15, 27

U.C.C. § 9-317(a)(2)(A) .........................................................................................38

U.C.C. § 9-319 ..................................................................................................16, 28

U.C.C. § 9-319(a) .......................................................................................15, 27, 28

U.C.C. § 9-320 .......................................................................................................14

U.C.C. § 9-322 ..................................................................................................14, 15

U.C.C. § 9-322(a) ..............................................................................................15, 27

U.C.C. § 9-324 ..................................................................................................17, 29

U.C.C. § 9-324(b) .............................................................................................17, 29

U.C.C. § 2-702(2) ...................................................................................................19

**Rules**

Fed. R. Bankr. P. 7056 .........................................................................................1, 2

Fed. R. Civ. P. 56 ................................................................................................1, 2

Fed. R. Civ. P. 56(a) ...............................................................................................2

**Treatises**

8A Am. Jur. 2d Bailments § 5 .................................................................................10

TSA Stores, Inc., TSA Ponce, Inc. and TSA Caribe, Inc. (collectively, "Plaintiffs"), by and through their undersigned counsel, hereby file this objection (the "Objection") to *Pinnacle Sport Equipment Inc.'s Motion for Partial Summary Judgment* [Adv. Proc. D.I. 14] (the "Motion") filed on April 27, 2016 by Pinnacle Sports Equipment Inc. ("Defendant").

Plaintiffs also hereby cross-move for summary judgment (the "Cross-Motion") pursuant to Rule 56 of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable herein by Rule 7056 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), that (A) Defendant's security interest in goods that Defendant shipped and delivered to Plaintiffs is subordinate to the prior perfected security interests of Plaintiffs' secured creditors pursuant to Article 9 and Article 2 of the Uniform Commercial Code ("UCC"); (B) Defendant's filing of a UCC-1 financing statement and purported perfection of its security interest in such goods constitutes a preferential transfer that is subject to avoidance and recovery pursuant to sections 547(b) and 550 of title 11 of the United States Code (the "Bankruptcy Code"); and (C) as a consequence of such avoidance and recovery under sections 547(b) and 550 of title 11 of the Bankruptcy Code, (i) pursuant to Article 9 and Article 2 of the UCC, Defendant has only an unperfected security interest in such goods and (ii) Defendant's unperfected security interest in such goods can be avoided and recovered by Plaintiffs pursuant to sections 544(a) and 550 of the Bankruptcy Code, such that Plaintiffs' interests in these goods trump those of Defendant.

In support of the Objection and Cross-Motion, Plaintiffs have attached (i) *Plaintiffs' (I) Statement of Disputed Material Facts in Support of Objection to Defendant Pinnacle Sport Equipment Inc.'s Motion for Partial Summary Judgment and (II) Statement of Undisputed Material Facts in Support of (A) Objection to Defendant Pinnacle Sport Equipment Inc.'s Motion for Partial Summary Judgment and (B) Cross-Motion for Summary Judgment* (the

"Statement of Facts"); (ii) the *Declaration of Stephen Binkley in Support of Plaintiffs'*

*(I) Objection to Defendant Pinnacle Sport Equipment Inc.'s Motion for Partial Summary*

*Judgment and (II) Cross-Motion for Summary Judgment* (the "Binkley Declaration"),

(iii) *Declaration of Stephen Coulombe in Support of Plaintiffs' (I) Objection to Defendant*

*Pinnacle Sport Equipment Inc.'s Motion for Partial Summary Judgment and (II) Cross-Motion*

*for Summary Judgment* (the "Coulombe Declaration"); and (iv) the *Declaration of Sabina Jacobs*

*in Support of Plaintiffs' (I) Objection to Defendant Pinnacle Sport Equipment Inc.'s Motion for*

*Partial Summary Judgment and (II) Cross-Motion for Summary Judgment* (the "Jacobs

Declaration"), each of which is filed concurrently herewith.  In further support of the Objection

and Cross-Motion, Plaintiffs respectfully state as follows:

## I.    LEGAL STANDARD FOR SUMMARY JUDGMENT

1.       Federal Rule 56, made applicable to this adversary proceeding by Bankruptcy

Rule 7056, provides that "[t]he court shall grant summary judgment if the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056.  "Summary judgment is designed

'to avoid trial or extensive discovery if facts are settled and dispute turns on issue of law.'"

*Burtch v. Detroit Forming, Inc. (In re Archway Cookies),* 435 B.R. 234, 238 (Bankr. D. Del.

2010) (citation omitted).

2.       The moving party bears the initial burden of showing the absence of a genuine

issue of material fact as to an essential element of the nonmovant's case, identifying those

portions of the pleadings, depositions, interrogatories, and admissions on file together with

affidavits, if any, which it believes demonstrates the absence of genuine issues for trial.  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  No genuine issue of material fact exists with respect

to a claim or claims "[w]here the record taken as a whole could not lead a rational trier of fact to

find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

3.      Once the moving party has met its burden, the burden shifts to the nonmoving party to demonstrate the existence of a genuine issue of fact by providing sufficient evidence for the ultimate trier of fact to find for the nonmovant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258 (1986); *United States v. Jamas Day Care Ctr. Corp.*, 152 Fed. App'x 171, 173 (3d Cir. 2005) (citations omitted); *Leonard v. General Motors Corp. (In re Headquarters Dodge)*, 13 F.3d 674, 679 (3d Cir. 1993); *Burch*, 435 B.R. at 239 (citations omitted). "A material fact is one which 'could alter the outcome' of the case." *Burch*, 435 B.R. at 239 (citations omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. A material fact "is genuine when it is 'triable,' that is, when reasonable minds could disagree on the result." *Burch*, 435 B.R. at 239 (citations omitted). "Importantly, all reasonable inferences must be drawn in favor of the nonmoving party and any doubt must be read in favor of the nonmovant." *Id.*; *see also Matsushita*, 475 U.S. at 587; *Liquidating Trust of U.S. Wireless Corp., Inc. v. Huffman (In re U.S. Wireless Corp., Inc.),* 386 B.R. 556, 560 (Bankr. D. Del. 2008).

4.      For the reasons set forth below, Defendant has failed to carry its burden in connection with the Motion. Therefore, the Motion should be denied. In contrast, Plaintiffs have met their burden in connection with the Cross-Motion. Accordingly, the Cross-Motion should be granted.

## II.    OBJECTION TO DEFENDANT'S MOTION

**A.    Summary of Argument in Support of Objection to Motion**

5.    The Motion must be denied because it rests on the following disputed,

unsubstantiated, and insupportable allegations and arguments:

> (a)    That the Vendor Agreement was somehow terminated prior to the
> commencement of Plaintiffs' chapter 11 cases.

6.    This allegation is false and finds no support in the record.  In fact, the only

evidence presented by Defendant – an email requesting return of consigned inventory – does not

mention any termination of the parties' contractual relationship.

> (b)    That the alleged termination of the Vendor Agreement converted the
> parties' consignment relationship into a bailment that requires Plaintiffs to
> return consigned inventory to Defendant.

7.    This allegation is contradicted by applicable law and facts.  *First*, the parties

never created a bailment relationship – theirs was purely a consignment relationship governed by

the Uniform Commercial Code ("UCC").  *Second*, because Defendant failed to (i) timely file a

UCC-1 financing statement to perfect its purchase money security interest in certain consigned

goods that had already been shipped and delivered to Plaintiffs (the "Consigned Goods") and

(ii) provide timely and adequate notice of its security interest in such Consigned Goods to

Plaintiffs' secured lenders, Defendant's interest in such Consigned Goods is subordinate to the

prior perfected security interests of such secured lenders.  *Third*, Defendant took no steps to

prosecute a valid reclamation demand either before or after the commencement of Plaintiffs'

chapter 11 cases, and any such demand is now time-barred and would not have prevailed over

the rights of Plaintiffs' secured lenders.  *Finally*, in accordance with customary practice in the

retail industry, "termination" of the consignment relationship would permit Defendant to cease

shipping additional inventory but would still permit Plaintiffs to sell down the Consigned Goods;

no return of such Consigned Goods is mandated under the parties' course of dealings or under the customary practice in the retail industry.

8.      Because Defendant has failed to carry its burden on summary judgment, the Motion should be denied.

**B.      The Motion Should be Denied Because It Rests on Disputed Material Facts.**

*1.      Defendant Has Not Established That the Vendor Agreement Was Terminated.*

9.      The Motion must fail because Defendant fails to establish the Motion's essential factual premise – that Defendant validly terminated the Vendor Agreement prior to the commencement of Plaintiffs' chapter 11 cases.  The only evidence put forward to support the existence of termination is an email from Defendant's CEO, Thomas M. Verrengia, dated February 19, 2016 (the "February 19 Email").  *See* Statement of Facts ¶ 3.  Notably, however, the February 19 Email fails to demonstrate any actual or intended termination of the Vendor Agreement or Defendant's consignment arrangement with Plaintiffs.

- The February 19 Email never uses the word (or any other words to the effect of) "termination."  Instead, Mr. Verrengia requests the return of inventory and offers Plaintiffs the opportunity to "purchase this inventory at a discounted price."  *See* Statement of Facts ¶ 3.

- Mr. Verrengia offers to "ship merchandise to [Plaintiffs]" after Plaintiffs have "resolved all . . . financial issues."  *See* Statement of Facts ¶ 3.

10.     As illustrated above and contrary to Defendant's allegation, the February 19 Email states Defendant's intention to *continue* – not to *terminate* – its relationship with Plaintiffs because Defendant offers to continue to "ship merchandise" once Plaintiffs have resolved their financial issues.  Therefore, the only evidence Defendant offers to support its allegation fails to demonstrate that Defendant terminated the Vendor Agreement.

11.     Defendant did not send any other correspondence to Plaintiffs, besides the February 19 Email, at any time before or after sending the February 19 Email, to terminate the Vendor Agreement.  *See* Statement of Facts ¶ 7.

12.     Moreover, the evidence reflects that Defendant continued to ship goods to Plaintiffs pursuant to the terms of the Vendor Agreement after sending the February 19 Email. *See* Statement of Facts ¶ 6.  Specifically, Plaintiffs received goods from Defendant on February 23, 2016.  *See id.*  Thus, Defendant's course of conduct belies the allegation that the Vendor Agreement had been terminated pursuant to the February 19 Email.

13.     Notably, Plaintiffs did not interpret the February 19 Email as a termination of the Vendor Agreement, and continued to sell in the ordinary course of their business the Consigned Goods.  *See* Statement of Facts ¶ 5.

14.     Furthermore, the Vendor Agreement does not contain any provision pursuant to which Defendant can terminate this agreement (*see* Statement of Facts ¶ 2), and Defendant has pointed to no provision therein to the contrary.

### *2.     Defendant Admitted That It Has a Consignment – Not a Bailment – Arrangement with Plaintiffs.*

15.     Although Defendant alleges that Plaintiffs "are merely bailees" (*see* Motion ¶ 10), the evidence refutes this allegation:

- The Vendor Agreement expressly states that it contemplates a consignment arrangement.  The signature page to the Vendor Agreement specifically provides:  "TSA and Vendor agree that the arrangement contemplated by this agreement shall be a ***consignment*** as defined in Section 9-102 of the Colorado and Delaware Uniform Commercial Codes."  *See* Statement of Facts ¶¶ 1, 8.

- Defendant admitted in the February 19 Email that it has a consignment arrangement with Plaintiffs.  Mr. Verrengia specifically wrote to Plaintiffs: "According to our records you currently have in your stores $437,055.10 worth of product.  All of this was sent to you on ***a consignment basis*** and none of it is owned by The Sports Authority."  *See* Statement of Facts ¶ 4.

- After sending the February 19 Email, Defendant sought to perfect its security interest in the Consigned Goods by filing a UCC-1 financing statement on March 1, 2016 (the "<u>Pinnacle UCC-1 Statement</u>").  *See* Statement of Facts ¶ 9.  On the face of the Pinnacle UCC-1 Statement, Defendant specifically designated a "Consignee/Consignor" relationship with Plaintiffs.  *See id.*

- Importantly, Defendant did **not** check the "Bailee/Bailor" box in the Pinnacle UCC-1 Statement.  *See* Statement of Facts ¶ 10.

16.     Therefore, by Defendant's own admissions and all other evidence in the record, its arrangement with Plaintiffs constitutes a consignment – not a bailment – and the Vendor Agreement memorialized this consignment arrangement.

### 3.     *Even If the Vendor Agreement Were Terminated, Termination Does Not Entitle Defendant to the Return of the Consigned Goods.*

17.     Even if the Vendor Agreement has been terminated (which Plaintiffs contend it was not), termination of the Vendor Agreement would not entitle Defendant to the return of the Consigned Goods.  First, the Vendor Agreement does not contain any provisions that grant Defendant the right to demand the return of the Consigned Goods.  By contrast, the Vendor Agreement specifically provides Plaintiffs with the right to demand the return of their tools, die, pattern or equipment furnished or paid for by Plaintiffs, and that Plaintiffs may elect to return any Consigned Goods to Defendant.  *See* Statement of Facts ¶ 2.

18.     Second, the course of dealing and course of performance between Plaintiffs and Defendant also fails to support Defendant's demand for the return of the Consigned Goods.  Statement of Facts ¶ 11.  Defendant has not previously demanded the return of goods delivered to Plaintiffs.  *See id.*  In fact, Defendant continued to ship goods to Plaintiffs, and Plaintiffs received additional Consigned Goods from Defendant, after Defendant allegedly terminated the Vendor Agreement pursuant to the February 19 Email.  *See* Statement of Facts ¶ 6.  Moreover, the customary practice of Plaintiffs specifically, and of other retailers in the industry, is that upon termination of a consignment arrangement, the vendor ceases to ship new inventory while the

retailer continues to sell down the inventory that had already been delivered and remits the

contracted proceeds of such sales to such vendor in accordance with the payment terms of the

applicable agreement.  *See* Statement of Facts ¶ 12.  This practice is standard in the retail

industry because, among other things, (a) it is generally too expensive and cumbersome for a

retail merchant to cull one specific vendor's goods from inventory and arrange for the return of

those goods to such vendor, (b) this return process will likely cause damage to the inventory and

therefore diminish its retail value, and (c) it is cost prohibitive for a vendor to pick up goods

from the retailer and then repackage and resell them to another retailer at a steep discount.  *See*

Statement of Facts ¶ 13.  Therefore, "termination" is not synonymous with the "ability to

demand the return of goods."

**C.**     **Defendant Is Not Entitled to Summary Judgment That Plaintiffs Are Bailees or That Consigned Goods Are Not Property of Plaintiffs' Estates Because the Undisputed Material Facts Demonstrate That Plaintiffs and Defendant Agreed to a Consignment Arrangement and That Defendant's Interest in Consigned Goods Is Subordinate to the Interests of Plaintiffs' Secured Lenders and to Plaintiffs' Interests as Debtors in Possession.**

*1.     The Arrangement Between Plaintiffs and Defendant Is Not a Bailment.*

19.     It is hornbook law that the consignment relationship between Plaintiffs and

Defendant does not constitute a bailment.  A bailment exists only when the bailee is obligated to

return the specific property delivered by the bailor to the bailee or otherwise follow the bailor's

direction for the disposition of such property.  "Inherent in the bailment relationship is the

requirement that the property be returned to the bailor, or duly accounted for by the bailee, when

the purpose of the bailment is accomplished, or that it be kept until it is reclaimed by the bailor."

*Id.*; *see also Glenshaw Glass Co. v. Ontario Grape Growers' Marketing Bd.*, 67 F.3d 470, 472

(3d Cir. 1995) ("[A] bailment occurs when property is entrusted to a party temporarily for some

purpose; upon the fulfillment of that purpose the property is 'redelivered to the person who

delivered it, or otherwise dealt with according to his directions or kept until he reclaims it.'"); *Payberg v. Harris*, 931 P.2d 544, 545 (Colo. App. 1996) ("[C]reation of a bailment requires that possession and control over the subject property pass to the bailee . . . [and] an underlying contract that the subject property will be returned or accounted for when the bailor reclaims it.").

20.   No bailment is established without a corresponding obligation on the part of the bailee to return the bailed property.  It is well established that "[i]f the purported bailee is not bound to return the same items that were delivered to him or her by the bailor, but may deliver any other item or items of equal value, ***there is no bailment***." *Mystic Color Lab, Inc. v. Auctions Worldwide, LLC,* 934 A.2d 227 (Conn. 2007) (emphasis added).  Put another way, "the test of a bailment is that ***the identical thing is to be returned*** in the same or in some altered form; if another thing of equal value is to be returned, the transaction is a sale." *In re Greenline Equip., Inc.,* 390 B.R. 576, 579 (Bankr. N.D. Miss. 2008) (emphasis added).  Moreover, "a bailment may not exist when the goods entrusted to a party properly are intermingled or commingled with goods belonging to others." *Mystic Color*, 934 A.2d at 235 (emphasis added).

21.   For example, in *In re Greenline Equipment, Inc.,* 390 B.R. 576, 581 (Bankr. N.D. Miss. 2008), the court held that the delivery of certain equipment for storage and not for the purpose of sale by the bailee constituted a bailment.  Similarly, in *Glenshaw Glass Co. v. Ontario Grape Growers' Marketing Board,* 67 F.3d 470, 472, 475-76 (3d Cir. 1995), the court concluded that where certain grape growers delivered grapes to a farm cooperative for processing, concentrating, storing, and loading the grapes for a fee, such transaction was a bailment, not a consignment, because the farm cooperative was obligated to return the processed grapes to the grape growers.  Other examples of bailments include delivery of property for repair or service, lending of personal property to a bailee for his or her use, and delivery and acceptance

of custody of personal property for safekeeping, transportation, or storage.  *See* 8A Am. Jur. 2d

Bailments § 5.

22.     Defendant's contentions that Plaintiffs are bailees with respect to the Consigned

Goods vis-a-vis Defendant cannot withstand the application of the foregoing authorities.  In

contrast to a bailment, the Vendor Agreement, as noted above, established a commercial

relationship pursuant to which Defendant delivered the Consigned Goods to Plaintiffs for sale by

Plaintiffs to Plaintiffs' customers, and in exchange Plaintiffs remitted an agreed-upon portion of

the proceeds to Defendant following the sale of such Consigned Goods.  *See* Statement of Facts

¶¶ 13-14.  The Vendor Agreement contains no provisions whatsoever that require Plaintiffs to

hold in trust for Defendant the Consigned Goods and to return such Consigned Goods to

Defendant upon termination of the Vendor Agreement.  *See* Statement of Facts ¶ 15.

Furthermore, in accordance with the customary practice in the retail industry, the effect of

termination by a merchant consignor like Defendant is that Defendant would no longer deliver

additional inventory to Plaintiffs, but Plaintiffs would have the right to continue to sell the

remaining goods on hand that were delivered by Defendant in exchange for remittance of the

agreed-upon proceeds thereof to Defendant until all such goods have been sold.  *See* Statement

of Facts ¶¶ 16-17.  The customary practice in the retail industry does not support compelling

retailers to return consigned goods to vendors.  *See id.*  Because Defendant has failed to establish

that its relationship with Plaintiffs constitutes a bailment rather than a consignment, the Motion

should be denied.

23.     Moreover, as set forth above, the parties agreed that the Vendor Agreement

established a consignment arrangement, and Defendant separately admitted (in the Pinnacle

UCC-1 Statement and in the February 19 Email) that its relationship with Plaintiffs constituted a

consignment, not a bailment.  *See* Statement of Facts ¶¶ 14, 20.  Thus, the facts in this case and applicable legal authority establish that Plaintiffs were consignees, not bailees, vis-a-vis Defendant.

24.    Notably, Defendant does not cite to a single case to support its argument that its consignment relationship with Plaintiffs should be recharacterized as a bailment.  This lack of legal support speaks volumes about the merits of Defendant's position.  Accordingly, the Motion should be denied.

### 2.    *The Arrangement Between Plaintiffs and Defendant Is a Consignment.*

25.    The arrangement between Plaintiffs and Defendant falls squarely within the legal construct of a consignment – not a bailment.  As a threshold matter, the Vendor Agreement states on its face that the relationship among the parties is a consignment governed by Article 9 of the UCC:  "TSA and Vendor agree that the arrangement contemplated by this agreement shall be *a consignment* as defined in Section 9-102 of the Colorado and Delaware Uniform Commercial Codes."  *See* Statement of Facts ¶ 14.  Therefore, Plaintiffs and Defendant agreed and intended from the outset of their relationship that Article 9 of the UCC would govern the consignment arrangement set forth in the Vendor Agreement.

26.    Under section 9-102 of the UCC, "consignment" is defined as "a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale and:

> (A) the merchant:
>
> > (i) deals in goods of that kind under a name other than the name of the person making delivery;
> >
> > (ii) is not an auctioneer; and
> >
> > (iii) is not generally known by its creditors to be substantially engaged in selling the goods of others;

(B) with respect to each delivery, the aggregate value of the goods is $1,000 or more at the time of delivery;

(C) the goods are not consumer goods immediately before delivery; and

(D) the transaction does not create a security interest that secures an obligation.

UCC § 9-102.

27.    Put simply, "[a] consignment exists where one party—usually a wholesaler—transfers possession of goods to another—usually a retailer—who in turn resells the goods to third-party consumers." *United States v. Nektalov*, 440 F. Supp. 2d 287, 298 (S.D.N.Y. 2006). Here, the commercial relationship between Plaintiffs and Defendant falls squarely within the definition of a "consignment" under section 9-102 of the UCC.  First, Defendant delivered the Consigned Goods to Plaintiffs so that Plaintiffs would sell such inventory to their customers.  *See* Statement of Facts ¶ 15.  Second, Plaintiffs are merchants[2] that deal in sporting goods under their own name, and not under Defendant's name.  Third, Plaintiffs are not auctioneers and are not generally known by [their] creditors to be substantially engaged in selling the goods of others.[3]

---

[2]    It is noteworthy that the term "merchant" is defined in Article 2 of the UCC:

"Merchant" means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

UCC § 2-104(1).  Here, Plaintiffs are sporting goods retailers and hold themselves out as such.

[3]    The burden of proof that an entity is "generally known by its creditors to be substantially engaged in selling the goods of others" in on the consignor.  In *In re Valley Media*, the court explained:

"Proving that the deliveree is generally known by its creditors to be substantially engaged in the selling of goods of others is ultimately the burden of the consignor.  The consignor must prove by a preponderance of the evidence (1) that the consignee is substantially engaged in selling the goods of others, and (2) that it is generally known by the creditors of the consignee that this is the case.  Both prongs of this test must be satisfied in order for the consignor ***to avoid the application of former U.C.C. § 2–326(3) and revised U.C.C. § 9–102(a)(20)***. . . .  In order to be 'substantially engaged' in selling the goods of others, a merchant must not hold less than 20% of the value of its inventory on a consignment basis. . . .  To satisfy the "generally known" prong of the test, the Objecting Vendors must prove that a majority of the debtor-

Notably, the record reflects that no more than approximately 14% of the Plaintiffs' inventory was available for sale on consignment." *See Stipulations of Fact Between Debtors and Term Loan Agent* [D.I. 1400] ¶ 3.  Fourth, Plaintiffs received from Defendant shipments the aggregate value of the Consigned Goods that Plaintiffs received from Defendant in 2015 exceeded $1,000. *See* Statement of Facts ¶ 19.  Fifth, the goods delivered by Defendant to Plaintiffs were not "consumer goods" (as defined in section 9-102(a)(23) of the UCC) because they were not "goods that are used or bought for use primarily for personal, family, or household purposes" immediately before delivery; instead, they were goods intended for resale to Plaintiffs' customers.  Finally, the Vendor Agreement was intended to enable Plaintiffs to sell goods delivered by Defendant to third parties (i.e., Plaintiffs' customers).  *See* Statement of Facts ¶¶ 14-15.

28.     The foregoing facts are bolstered by Defendant's admissions.  First, as noted above, the parties agreed in the Vendor Agreement that their relationship constitutes a "consignment."  *See* Statement of Facts ¶ 14.  Second, Defendant admitted in the February 19 Email that it delivered goods to Plaintiffs "on a consignment basis."  *See* Statement of Facts ¶ 20.  Third, Defendant filed the Pinnacle UCC-1 Statement – a necessity under consignment law.  *See* Statement of Facts ¶ 26.  Finally, Defendant checked the box on the UCC-1 financing statement designating a "Consignee/Consignor" relationship with Plaintiffs.  *See id.*  Notably, Defendant left the "Bailee/Bailor" box blank.  *See id.*

---

consignee's creditors were aware that the consignee was substantially engaged in selling the goods of others, i.e. consignment sales."

*In re Valley Media, Inc.*, 279 B.R. 105, 124-25 (Bankr. D. Del. 2002) (emphasis added) (citations omitted).

### 3.    The Consignment Arrangement Entitles Defendant to Only a Purchase Money Security Interest in the Consigned Goods.

29.    Pursuant to its consignment arrangement and for the reasons discussed in detail in the Cross-Motion below, Defendant's interest in the Consigned Goods is reduced to a purchase money security interest.  Where a commercial relationship meets the definition of "consignment" under Article 9, section 9-103(d) of the UCC provides:  "The security interest of a consignor in goods that are the subject of a consignment is a purchase-money security interest in inventory."

30.    Therefore, Defendant holds at most a purchase money security interest in the Consigned Goods, but for the reasons set forth below, such security interest is necessarily subordinate to the competing interests of Plaintiffs and Plaintiffs' secured lenders in the Consigned Goods by the application of established UCC priority rules.

### 4.    As a Consignor That Failed to Obtain Priority, Defendant's Interest Is Subordinate to the Interests of Plaintiffs' Secured Lenders.

31.    Defendant cannot compel the return of the Consigned Goods because Defendant's interest in such Consigned Goods is junior to the prior perfected secured interests of Plaintiffs' secured lenders.  As noted above, the UCC provides that Defendant holds nothing more than a purchase money security interest in the Consigned Goods, as discussed in further detail in the Cross-Motion.  The priority of Defendant's interest in the Consigned Goods vis-a-vis other creditors is governed by the "first to file" rules of Article 9 in the UCC.  The Official Comments to section 9-103 of the UCC explain that "the priority of the consignor's interest as against the rights of lien creditors of the consignee, competing secured parties, and purchasers of the goods from the consignee can be determined by reference to the priority rules generally applicable to inventory, such as sections 9-317, 9-320, 9-322, and 9-324 [of the UCC]."  UCC § 9-103, cmt. 6.

32.    The rules of priority are clearly stated in Article 9 of the UCC.  Perfected security interests have priority over unperfected interests, and prior perfected interests have priority over

subsequently perfected security interests.  *See* UCC §§ 9-317, 9-322.  Specifically, UCC § 9-317

provides that a security interest is subordinate to a security interest that is entitled to priority

under UCC § 9-322.  *See* UCC § 9-317(a)(1).  Section 9-322 of the UCC provides that

conflicting security interests are ranked according to priority by time of perfection (i.e., the date

of filing of UCC-1 financing statement), and that a perfected security interest has priority over a

conflicting unperfected security interest in the same collateral and proceeds thereof.  *See* UCC

§ 9-322(a).  "[T]he rules pertaining to lien creditors, buyers, and attachment, perfection, and

priority of competing security interests apply to consigned goods."  UCC § 9-109, cmt. 6.

Importantly, section 9-319(a) of the UCC provides that "for purposes of determining the rights of

creditors of, and purchasers for value of goods from, a consignee, while the goods are in the

possession of the consignee, the consignee is deemed to have rights and title to the goods

identical to those the consignor had or had power to transfer."  Therefore, the Consigned Goods.

because they are in Plaintiffs' possession, are subject to liens by Plaintiffs' creditors pursuant to

UCC § 9-319(a).

33.      In fact, Defendant admits in the Motion that UCC § 9-319(a) subjects the

consigned goods of consignors who failed to timely perfect their security interests to the liens of

a consignee's creditors.  *See* Motion ¶ 7.  Citing *Valley Media*, Defendant states:  "These

consignors had, in every instance, failed to perfect their security interests, and the Court

conceded that all consigned goods were subject to the provisions of U.C.C. Section 9-319(a);

judicial lien creditors had superior rights to the consigned assets.  This analysis was not disputed

there and ***is not in dispute here***."  *See* Motion ¶ 8.  Thus, Defendant agrees that its interest in the

Consignged Goods is subject to section 9-319(a) of the UCC, the prior perfected security

interests of the secured lenders, and the interests of a judicial lien creditors.

34.     Similarly, the ability of Plaintiffs' creditors to assert a security interest in the Consigned Goods applies with equal force under Article 2 of the UCC.  Section 2-326(a) of the UCC provides that "[g]oods held on approval are not subject to the claims of the buyer's creditors until acceptance; goods held on sale or return are subject to such claims while in the buyer's possession."  UCC § 2-326(2) (emphasis added).  Because the Vendor Agreement provides that Plaintiffs have the right to return unsold Consigned Goods to Defendant (*see* Statement of Facts ¶ 15), UCC § 2-326(1) renders such a transaction a "sale or return" because the Consigned Goods were "may be returned by the buyer even though they conform to the contract" and were "delivered primarily for resale."  UCC § 2-326(1).  Therefore, the Consigned Goods in Plaintiffs' possession are subject to liens by Plaintiffs' creditors pursuant to both section 9-319 and section 2-326 of the UCC.

35.     As a matter of law, therefore, Defendant loses the priority battle under the UCC with Plaintiffs' secured lenders (the "Secured Lenders").  The Secured Lenders perfected their security interests in substantially all of Plaintiffs' assets, including goods and inventory in 2006, before Defendant perfected its security interest.  *See* Statement of Facts ¶¶ 23-25.  Defendant failed to file any UCC-1 financing statement until March 1, 2016.  *See* Statement of Facts ¶ 26.  Thus, the Secured Lenders' UCC-1 financing statements preceded the Pinnacle UCC-1 Statement by approximately 10 years.  In accordance with sections 9-317 and 9-322 of the UCC, the Secured Lenders' *prior* perfected security interests in, among other things, the Consigned Goods, take priority over Defendant's *subsequently* perfected security interest.  Likewise, the Secured Lenders' *perfected* security interests in such Consigned Goods take priority over Defendant's *unperfected* security interest (to the extent Defendant's security interest is deemed to be unperfected by operation of section 547(b) avoidance, as discussed below).

36.     It is noteworthy that section 9-324 of the UCC provides a method by which a holder of perfected purchase money security interest in the Consigned Goods and the proceeds can take priority over a conflicting (i.e., prior perfected) security interest – a path **not** taken by the Defendant.  To obtain priority of its purchase money security interest in the Consigned Goods, Defendant must have met the following conditions:  (1) Defendant's purchase money security interest was perfected when Plaintiffs received possession of the Consigned Goods; (2) Defendant sent an authenticated notification to holders of conflicting security interest (i.e., the Secured Lenders); (3) the Secured Lenders received such notification within five years before Plaintiffs received possession of the Consigned Goods delivered by Defendant; and (4) such notification stated that Defendant has or expects to acquire a purchase money security interest in the Consigned Goods as described in the notification.  *See* UCC § 9-324(b).

37.     Here, Defendant failed to meet each of these conditions: (a) by March 1, 2016 – the date of the purported perfection of Defendant's security interest, Plaintiffs had already received substantially all of the Consigned Goods Defendant now seeks to reclaim (*see* Statement of Facts ¶¶ 23, 26-27), and (b) Defendant failed to notify any of the Secured Lenders of its security interest (*see* Statement of Facts ¶ 28).  Therefore, Defendant failed to obtain priority of its security interest in the Consigned Goods over the prior perfected security interests of the Secured Lenders.

38.     Defendant's reliance on *In re Valley Media, Inc.*, 279 B.R. 105 (Bankr. D. Del. 2002) for the proposition that the UCC's priority rules do not apply is unavailing.  In *Valley Media*, a certain vendor that only "sent a demand letter for the return of its inventory" did not prevail against the rights of competing creditors even though such consignor alleged it had terminated its distribution agreement before the debtors filed for bankruptcy.  *Id.* at 143-44.  In

refusing to grant such vendor's motion for relief, the court expressly found that "[n]o other letters regarding termination or intent not to renew were submitted to the Court by either party." *Id.* at 143. Ultimately, the court held in abeyance any determination regarding such vendor's rights "pending further submissions by the parties . . . [to] address evidence of the dealings between [the parties]." *Id.* at 144. Importantly, the court considered whether the agreement was terminated in accordance with the termination provisions in the applicable agreements. *Id.* at 137 (finding that "none of the Objecting Vendors have demonstrated that they successfully terminated the Distribution Agreements prepetition according to the termination provisions in those agreements"). Specifically, the court addressed separately the allegations of "three Objecting Vendors who put forth some concrete factual allegations that <u>conformed to these two termination provisions</u> in the Distribution Agreements." *Id.* at 142. Furthermore, the court took notice of the customary practices in the debtors' industry, namely that debtors retained the right to return inventory to vendors at the vendors' expense, but was not swayed that the potential inequities of such practices should afford the vendors relief they did not otherwise negotiate. *Id.* ("The Objecting Vendors were aware of the commercial realities of their industry's return policy and I see no reason to relieve them of a burden common to all members of that industry.").

39.    Here, the February 19 Email constitutes nothing more than a demand for the return of delivered goods, much like the comparable "demand letter for the return of its inventory" by the vendor in *Valley Media* discussed above. However, unlike the vendor in *Valley Media*, here there is no termination provision in the Vendor Agreement. In accordance with the decision in *Valley Media*, without further evidence of termination and the parties' course of dealings, the Motion should not be granted. In any event, the customary practice in the retail industry does not support Defendant's allegations that termination entitles Defendant to the

return of the Consigned Goods.  Indeed, customary practice refutes such allegations.  As in

*Valley Media*, the uncontroverted customary practice in the retail industry should apply with

equal force to the commercial relationship between Plaintiffs and Defendant, and should permit

Plaintiffs to continue selling the Consigned Goods.

40.     Accordingly, the Motion must be denied because, as a matter of law, the

application of the UCC's priority rules provide that Defendant's interest in the Consigned Goods

is subordinate to the perfected security interests of the Secured Lenders.

> **5.     *Defendant Has Not Successfully Prosecuted – and Cannot Successfully Prosecute – a Reclamation Demand.***

41.     Defendant does not have the right to reclaim and recover the Consigned Goods

because it is unable to successfully prosecute a reclamation demand.  Under both the Bankruptcy

Code and the UCC, a vendor demanding the return of delivered goods must prosecute a

reclamation demand and prevail.  11 U.S.C. § 546(c); UCC § 2-702.  To effectuate reclamation

under section 546(c) of the Bankruptcy Code or section 2-702 of the UCC, a vendor must make a

timely written demand for reclamation of the goods.  11 U.S.C. § 546(c)(1) (requiring written

demand not later than 20 days after the date of commencement of the bankruptcy case); UCC

§ 2-702(2) (requiring written demand not later than 10 days after receipt of the goods by the

buyer).  Further, such a reclamation claim may require a vendor to seek relief from the automatic

stay to exercise its reclamation rights and no such relief has been sought.  *See In re Circuit City*

*Stores, Inc.,* 441 B.R. 496, 506-507 (Bankr. E.D. Va. 2010) (suggesting that enforcement of a

reclamation demand in a bankruptcy case would require, at a minimum, a motion for relief from

the automatic stay).

42.     However, both section 546(c) of the Bankruptcy Code and section 2-702 of the

UCC provide that reclamation rights of a seller are subject to the rights of the buyer's secured

lenders.  11 U.S.C. § 546(c); UCC § 2-702(3); *see also Simon & Schuster, Inc. v. Advanced Mktg. Servs. (In re Advanced Mktg. Servs.)*, 360 B.R. 421, 426 (Bankr. D. Del. 2007) (under the express language of section 546(c) of the Bankruptcy Code, senior lenders' prepetition and postpetition liens on debtors' inventory were superior to seller's reclamation claim); *Allegiance Health Care Corp. v. Primary Health Sys., Inc. (In re Primary Health Sys.),* 258 B.R. 111, 114 (Bankr. D. Del. 2001) ("It is well-established that, absent a showing of bad faith, a creditor with a prior perfected security interest in inventory which contains an after-acquired property clause is a good faith purchaser under the UCC."); *In re Child World*, 145 B.R. 5, 7 (Bankr. S.D.N.Y. 1992) ("Because of the existence of a prior perfected interest, the court would be required to deny a reclamation application . . . ."); *Lavonia Mfg. Co. v. Emery Corp.*, 52 B.R. 944, 947 (E.D. Pa. 1985) (finding a creditor with a perfected security interest in after-acquired property was a good faith purchaser whose claim was superior to that of a reclaiming seller and noting that "[a]ny seeming unfairness to [seller] in this result is dispelled by recognition of the fact that the seller could have protected its interest by complying with the UCC's purchase money provisions.").

43.     Here, Defendant has not prosecuted a reclamation demand to recover any of the Consigned Goods it delivered to Plaintiffs under either section 546(c) of the Bankruptcy Code or section 2-702 of the UCC.  In fact, Defendant missed its opportunity to file a reclamation demand before and after Plaintiffs commenced their chapter 11 cases.  Moreover, assuming that Defendant had made a reclamation demand for the Consigned Goods, it could not have prevailed because its reclamation rights are subject to the prior perfected security interests of the Secured Lenders in such Consigned Goods.

44.    Accordingly, because Defendant cannot prevail on a reclamation demand under the Bankruptcy Code or the UCC, the Motion must be denied.

## III.    PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT[4]

### A.    Summary of Argument in Support of Cross-Motion

45.    The Cross-Motion should be granted because Plaintiffs have met their burden of establishing through undisputed facts the following key issues: *First*, Plaintiffs and Defendant entered into a "consignment" arrangement under UCC § 9-102, apursuant to which Defendant was entitled to obtain only a purchase money security interest governed by Article 9 of the UCC. *Second*, Defendant failed to provide a notice to the Secured Lenders and thereby failed to obtain priority of its security interest, such that the Secured Lenders' prior perfected security interests prevail over Defendant's subsequently perfected and avoidable security interest. *Third*, Defendant did not perfect its security interest in the Consigned Goods until the day before Plaintiffs filed their chapter 11 cases – making it an avoidable preference transfer. *Fourth*, assuming Defendant's security interest is avoided, Plaintiffs' rights as debtors in possession prevail over Defendant's unperfected security interest in the Consigned Goods.

### B.    Plaintiffs Are Entitled to Summary Judgment That Defendant's Security Interest Is Subordinate to the Prior Perfected Security Interests of Plaintiffs' Secured Lenders.

46.    Defendant's security interest in goods delivered to Plaintiffs is subordinate to the prior perfected security interests of the secured lenders in such goods.

---

[4]    Certain facts and arguments that are included in this section have already been incorporated in the Objection, but are repeated in this section for the completeness and for the Court's convenience.

### a.  *Article 9 of the UCC Governs the Vendor Agreement.*

47.     As a threshold matter, the Vendor Agreement is governed by Article 9 of the

UCC.  First, the applicability of Article 9 of the UCC expressly appears on the face of the

Vendor Agreement.  The signature page to the Vendor Agreement provides:

> TSA and the Vendor agree that the arrangement contemplated by
> this agreement shall be a ***consignment as defined in Section 9-102
> of the Colorado and Delaware Uniform Commercial Codes***.  The
> Vendor shall retain title to all goods subject to this agreement until
> the date of sale at which time title shall pass from the Vendor to
> the purchaser of such goods.  The Vendor shall be entitled to file
> UCC-1 Financing Statements to reflect this consignment.

*See* Statement of Facts ¶ 14.

48.     Accordingly, Plaintiffs and Defendant necessarily agreed and intended, at the

outset, that Article 9 of the UCC would govern the arrangement set forth in the Vendor

Agreement.  Section 9-102(20) of the UCC defines "consignment" as follows:

> "Consignment" means a transaction, regardless of its form, in
> which a person delivers goods to a merchant for the purpose of sale
> and:
>
> (A) the merchant:
>
>> (i) deals in goods of that kind under a name other than the
>> name of the person making delivery;
>>
>> (ii) is not an auctioneer; and
>>
>> (iii) is not generally known by its creditors to be
>> substantially engaged in selling the goods of others;
>
> (B) with respect to each delivery, the aggregate value of the goods
> is $1,000 or more at the time of delivery;
>
> (C) the goods are not consumer goods immediately before
> delivery; and
>
> (D) the transaction does not create a security interest that secures
> an obligation.

UCC § 9-102.

49.     Here, the commercial relationship between Plaintiffs and Defendant falls squarely within the definition of a "consignment" under section 9-102 of the UCC.  A contrary assertion ignores the following plain facts: (a) the Consigned Goods were delivered to Plaintiffs for the purpose of sale; (b) Plaintiffs are merchants[5] that deal in sporting goods under their own name, and not under Defendant's name; (c) Plaintiffs are not auctioneers and are "not generally known by [their] creditors to be substantially engaged in selling the goods of others";[6] (d) Plaintiffs received from Defendant in 2015 Consigned Goods valued in the aggregate at more than $1,000; (e) the Consigned Goods were not "consumer goods" – which are defined in section 9-102(a)(23) of the UCC as "goods that are used or bought for use primarily for personal, family, or household purposes" immediately before delivery; and (f) the transaction between Plaintiffs and Defendant was intended to enable Plaintiffs to sell the Consigned Goods to third parties and did not create a security interest to secure an obligation.

---

[5]     It is noteworthy that the term "merchant" is defined in Article 2 of the UCC:

> "Merchant" means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

UCC § 2-104(1).  Here, Plaintiffs are sporting goods retailers and hold themselves out as such.

[6]     In *In re Valley Media*, the court explained:

> "Proving that the deliveree is generally known by its creditors to be substantially engaged in the selling of goods of others is ultimately the burden of the consignor.  The consignor must prove by a preponderance of the evidence (1) that the consignee is substantially engaged in selling the goods of others, and (2) that it is generally known by the creditors of the consignee that this is the case.  Both prongs of this test must be satisfied in order for the consignor ***to avoid the application of former U.C.C. § 2–326(3) and revised U.C.C. § 9–102(a)(20)***. . . .  In order to be 'substantially engaged' in selling the goods of others, a merchant must not hold less than 20% of the value of its inventory on a consignment basis. . . .  To satisfy the "generally known" prong of the test, the Objecting Vendors must prove that a majority of the debtor-consignee's creditors were aware that the consignee was substantially engaged in selling the goods of others, i.e. consignment sales."

*In re Valley Media, Inc.*, 279 B.R. 105, 124-25 (Bankr. D. Del. 2002) (emphasis added)(citations omitted).  No such evidence has been proffered by Defendant in support of the proposition that Article 9 does not apply to the Vendor Agreement.

**b.     *The Vendor Agreement Is a Contract for Sale Under Article 2.***

50.     As established above, Article 9 applies to "consignments" defined in UCC § 9-201.  Article 2 applies to contracts between buyers and sellers.  Both apply to the Vendor Agreement.  As revised, Article 2 of the UCC broadly defines the terms "buyer," "seller" and "contract for sale."  Under section 2-103(1) of the UCC, a "buyer" is "a person who buys or ***contracts to buy*** goods" and a "seller" is "a person who sells or ***contracts to sell*** goods."  UCC § 2-103(1)(a), (d) (emphasis added).  In concert with these definitions, a "contract for sale" is defined to include "both a present sale of goods and a ***contract to sell goods at a future time***."  UCC § 2-106(1) (emphasis added).  Section 2-106(1) of the UCC further explains that "[a] 'sale' consists in the ***passing of title*** from the seller to the buyer for a price (Section 2-401)."  UCC § 2-106(1) (emphasis added).  These definitions make it clear that contracts for future sales, include future passages of title, fall within the ambit of Article 2.  Under the Vendor Agreement, Defendant shipped the Consigned Goods to Plaintiffs to enable Plaintiffs to sell the Consigned Goods to their retail customers.  Thus, a "contract of sale" unambiguously encompasses arrangements to "sell goods at a future time" (i.e., after delivery to Plaintiffs).  The Vendor Agreement states that "title to the Merchandise shall transfer through [Plaintiffs] to the customer upon a sale to such customer."  Vendor Agreement ¶ 4.  Moreover, Plaintiffs "contract[] to buy goods" and Defendant "contracts to sell goods."  The terms and content of the Vendor Guide demonstrate this fact.  The Vendor Agreement contemplates that Plaintiffs may "issue purchase orders . . . to [Defendant]" and that Plaintiffs will engage in "sales of [Defendant]'s merchandise."  *See, e.g.,* Vendor Guide ¶¶ 1, 22.

### c. *UCC Article 2 Converts a Retention of Title in Goods Shipped or Delivered to a Reservation of a Security Interest in Such Goods.*

51.     Although the Vendor Agreement purports to control the timing of the transfer of title to goods delivered by Defendant to Plaintiffs by reserving title to such goods in Defendant, with respect to goods that have already been shipped or delivered to Plaintiffs, the UCC converts such reservation to a reservation of a security interest in such goods.  Specifically, section 2-401 of the UCC prevents a contract from changing ***when*** title to goods that have been delivered passes from seller to buyer.  Specifically, section 2-401(1) of the UCC provides that:

> Any retention or reservation by the seller of the title (property) in goods <u>shipped or delivered</u> to the buyer is limited in effect to a <u>reservation of a security interest</u>.  Subject to these provisions and to the provisions of the Article on Secured Transactions (Article 9), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.

UCC § 2-401(1) (emphasis added).

52.     Thus, section 2-401 of the UCC operates to convert a provision in a contract for sale that provides for the reservation of retention of title in favor of a seller into a reservation of a security interest with respect to goods that have already been shipped or delivered.  This restriction on title retention provisions also is expressly reflected in the definition of "security interest" in the UCC, which includes "<u>any interest of a consignor</u> and a buyer of accounts, chattel paper, a payment intangible, or a promissory note in a transaction that is subject to Article 9.  . . . <u>The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer under Section 2-401 is limited in effect to a reservation of a 'security interest.'</u>"  UCC § 1-201(35) (emphasis added).  Therefore, section 2-401(1) of the UCC operates to convert the purported retention of title in the Vendor Agreement to a security interest in the Consigned Goods.

25

### d.   *Defendant Is Entitled to Only a Purchase Money Security Interest in the Consigned Goods.*

53.     Where a commercial relationship meets the definition of "consignment" under Article 9, section 9-103(d) of the UCC provides:  "The security interest of a consignor in goods that are the subject of a consignment is a purchase-money security interest in inventory."  The Official Comments to section 9-103 of the UCC explain that "the priority of the consignor's interest as against the rights of lien creditors of the consignee, competing secured parties, and purchasers of the goods from the consignee can be determined by reference to the priority rules generally applicable to inventory, such as sections 9-317, 9-320, 9-322, and 9-324 [of the UCC]."  UCC § 9-103, cmt. 6.

54.     Indeed, Article 9 specifically applies to, *inter alia*, "security interests **arising under Section 2-401**."  UCC § 9-109(a)(6) (emphasis added).  Therefore, pursuant to section 2-401 and section 9-103 of the UCC, the only interest Defendant has in the Consigned Goods is a purchase money security interest therein that is subject to the perfection and priority rules of Article 9, which requires, among other things, the filing of a UCC-1 financing statement.  In fact, Defendant filed a UCC-1 financing statement in perfect its security interest in accordance with the provisions of Article 9 of the UCC – albeit one day before Plaintiffs filed for bankruptcy protection – in which it designated a "Consignee/Consignor" relationship.  *See* Statement of Facts ¶ 26.

### e.   *Defendant's Security Interest is Subordinate to the Prior Perfected Security Interests of the Secured Lenders.*

55.     Under the UCC, Defendant holds nothing more than a purchase money security interest.  The priority of Defendant's interest in the inventory vis-a-vis other creditors is governed by the "first to file" rules of Article 9 in the UCC.  The Official Comments to section 9-103 of the UCC explain that "the priority of the consignor's interest as against the rights of lien

creditors of the consignee, competing secured parties, and purchasers of the goods from the consignee can be determined by reference to the priority rules generally applicable to inventory, such as sections 9-317, 9-320, 9-322, and 9-324 [of the UCC]."  UCC § 9-103, cmt. 6.

56.    The rules of priority are clearly stated in Article 9 of the UCC.  Perfected security interests have priority over unperfected interests, and prior perfected interests have priority over subsequently perfected security interests.  *See* UCC §§ 9-317, 9-322.  Specifically, UCC § 9-317 provides that a security interest is subordinate to a security interest that is entitled to priority under UCC § 9-322.  UCC § 9-317(a)(1).  UCC § 9-322 provides that conflicting security interests are ranked according to priority by time of perfection (i.e., the date of filing of UCC-1 financing statement), and that a perfected security interest has priority over a conflicting unperfected security interest in the same collateral and proceeds thereof.  UCC § 9-322(a). "[T]he rules pertaining to lien creditors, buyers, and attachment, perfection, and priority of competing security interests apply to consigned goods."  UCC § 9-109, cmt. 6.  Importantly, section 9-319(a) of the UCC provides that "for purposes of determining the rights of creditors of, and purchasers for value of goods from, a consignee, while the goods are in the possession of the consignee, the consignee is deemed to have rights and title to the goods identical to those the consignor had or had power to transfer."  Therefore, the Consigned Goods, because they are in Plaintiffs' possession, are subject to liens by Plaintiffs' creditors pursuant to UCC § 9-319(a).

57.    In fact, Defendant admits in the Motion that UCC § 9-319(a) subjects the consigned goods of consignors who failed to timely perfect their security interests to the liens of a consignee's creditors.  *See* Motion ¶ 7.  Citing *Valley Media*, Defendant states:  "These consignors had, in every instance, failed to perfect their security interests, and the Court conceded that all consigned goods were subject to the provisions of U.C.C. Section 9-319(a);

judicial lien creditors had superior rights to the consigned assets.  This analysis was not disputed there and ***is not in dispute here***."  Motion ¶ 8.  Thus, Defendant agrees that its interest in the Consigned Goods is subject to Section 9-319(a), the prior perfected security interests of the secured lenders, and the interests of a judicial lien creditors.

58.     Similarly, the ability of Plaintiffs' creditors to assert a security interest in the Consigned Goods applies with equal force under Article 2 of the UCC.  UCC § 2-326(a) provides that "[g]oods held on approval are not subject to the claims of the buyer's creditors until acceptance; goods held on sale or return are subject to such claims while in the buyer's possession."  UCC § 2-326(2) (emphasis added).  Because the Vendor Agreement provides that Plaintiffs have the right to return unsold Consigned Goods to Defendant (see Statement of Facts ¶ 15), UCC § 2-326(1) renders such a transaction a "sale or return" because the Consigned Goods were "may be returned by the buyer even though they conform to the contract" and were "delivered primarily for resale."  UCC § 2-326(1).  Therefore, the Consigned Goods in Plaintiffs' possession are also subject to liens by Plaintiffs' creditors pursuant to both section 9-319 and section 2-326 of the UCC.

59.     As a matter of law, therefore, Defendant loses the priority battle under the UCC with the secured lenders.  The secured lenders perfected their security interests in substantially all of Plaintiffs' assets, including goods and inventory in 2006, before Defendant perfected its security interest.  Defendant failed to file any UCC-1 financing statement until March 1, 2016.  Thus, the secured lenders' UCC-1 financing statements preceded that filed by Defendant by several years.  In accordance with sections 9-317 and 9-322 of the UCC, the secured lenders' *prior* perfected security interests in, among other things, goods delivered to Plaintiffs by Defendant, take priority over Defendant's *subsequently* perfected security interest.  Likewise, the

secured lenders' *perfected* security interests in such goods take priority over Defendant's *unperfected* security interest (to the extent Defendant's security interest is deemed to be unperfected by operation of section 547(b) avoidance, as discussed below).

60.    It is noteworthy that section 9-324 of the UCC provides a method by which a holder of perfected purchase money security interest in inventory and the proceeds can take priority over a conflicting (i.e., prior perfected) security interest – a path **not** taken by the Defendant.  To obtain priority of its purchase money security interest, Defendant must have met the following conditions:  (1) Defendant's purchase money security interest was perfected when Plaintiffs received possession of the inventory; (2) Defendant sent an authenticated notification to holders of conflicting security interest (i.e., Plaintiffs' secured lenders); (3) Plaintiffs' secured lenders received such notification within five years before Plaintiffs received possession of goods delivered by Defendant; and (4) such notification stated that Defendant has or expects to acquire a purchase money security interest in such Consigned Goods as described in the notification.  UCC § 9-324(b).  Here, Defendant failed to meet each of these conditions: (a) by March 1, 2016 – the date of the purported perfection of Defendant's security interest, Plaintiffs had already received all goods Defendant now seeks to reclaim, and (b) Defendant failed to notify any of Plaintiffs' secured lenders of its security interest.  Therefore, Defendant failed to obtain priority of its security interest over the prior perfected security interests of Plaintiffs' secured lenders.

61.    Defendant's reliance on *In re Valley Media, Inc.*, 279 B.R. 105 (Bankr. D. Del. 2002) for the proposition that the UCC's priority rules do not apply is unavailing.  In *Valley Media*, a certain vendor that  only "sent a demand letter for the return of its inventory" did not prevail against the rights of competing creditors even though such consignor alleged it had

terminated its distribution agreement before the debtors filed for bankruptcy. *Id.* at 143-44.  In refusing to grant such vendor's motion for relief, the court expressly found that "[n]o other letters regarding termination or intent not to renew were submitted to the Court by either party." *Id.* at 143.  Ultimately, the court held in abeyance any determination regarding such vendor's rights "pending further submissions by the parties . . . [to] address evidence of the dealings between [the parties]." *Id.* at 144.  Importantly, the court considered whether the agreement was terminated in accordance with the termination provisions in the applicable agreements. *Id.* at 137 (finding that "none of the Objecting Vendors have demonstrated that they successfully terminated the Distribution Agreements prepetition according to the termination provisions in those agreements").  Specifically, the court addressed separately the allegations of "three Objecting Vendors who put forth some concrete factual allegations that <u>conformed to these two termination provisions</u> in the Distribution Agreements." *Id.* at 142.  Furthermore, the court took notice of the customary practices in the debtors' industry, namely that debtors retained the right to return inventory to vendors at the vendors' expense, but was not swayed that the potential inequities of such practices should afford the vendors relief they did not otherwise negotiate. *Id.* ("The Objecting Vendors were aware of the commercial realities of their industry's return policy and I see no reason to relieve them of a burden common to all members of that industry.").

62.      Here, the February 19 Email constitutes nothing more than a demand for the return of the Consigned Goods, much like the comparable "demand letter for the return of its inventory" by the vendor in *Valley Media* discussed above.  However, unlike the vendor in *Valley Media*, here there is no termination provision in the Vendor Agreement that the Court can analyze to determine whether Defendant validly terminated the Vendor Agreement and the effect of termination.  In accordance with the decision in *Valley Media*, without further evidence of

termination and the parties' course of dealings, the Motion should not be granted.  In any event, the customary practice in the retail industry does not support Defendant's allegations that termination entitles Defendant to the return of the Consigned Goods.  Indeed, customary practice refutes such allegations.  As in *Valley Media*, the uncontroverted customary practice in the retail industry should apply with equal force to the commercial relationship between Plaintiffs and Defendant, and should permit Plaintiffs to continue selling goods delivered by Plaintiffs.

63.    Accordingly, Plaintiffs are entitled to summary judgment that, as a matter of law, Defendant's security interest in goods delivered to Plaintiffs is subordinate to the prior perfected security interests of Plaintiffs' secured lenders in such goods pursuant to the application of the UCC's priority rules.

**C.    Plaintiffs Are Entitled to Summary Judgment That Plaintiffs Have an Interest in the Consigned Goods That Is Superior to Defendant's Interest in the Consigned Goods.**

64.    Defendant holds an unperfected security interest in goods delivered to Plaintiffs. However, because Defendant perfected its security interest just one day before the Petition Date, and months after Defendant became a creditor of the Plaintiffs, Defendant's perfection of its security interest is avoidable and recoverable as a preference under sections 547(b) and 550 of the Bankruptcy Code.  As a consequence of such avoidance and recovery, Defendant holds only an unperfected security interest that is thereafter avoidable by Plaintiffs, armed with the rights of judicial lien creditors to avoid and recover unperfected security interests under sections 544(a) and 550 of the Bankruptcy Code.  Accordingly, Plaintiffs' rights in goods delivered to Plaintiffs prevail over Defendant's security interest therein.

1.    *Defendant's UCC-1 Financing Statement Is an Avoidable and Recoverable Preferential Transfer Under Sections 547(b) and 550 of the Bankruptcy Code.*

65.    Under section 547(b) of the Bankruptcy Code, a transfer of an interest of the debtor in property is avoidable as a preferential transfer if it (1) is to or for the benefit of a creditor, (2) is for or on account of an antecedent debt owed by the debtor before such transfer was made, (3) is made while the debtor was insolvent, (4) is made on or within 90 days before the date of the filing of the petition, and (5) enables such creditor to receive more than such creditor would receive in a chapter 7 liquidation of the debtor.  11 U.S.C. § 547(b).

66.    Section 550 provides that the Plaintiff can recover "the property transferred, or, if the court so orders, the value of such property" from the initial transferee.  11 U.S.C. § 550(a). "Section 550(a) is intended to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred."  *In re Classic Drywall, Inc.,* 127 B.R. 874, 876 (D. Kan. 1991); *see also In re Tronox Inc.,* 464 B.R. 606, 614 (Bankr. S.D.N.Y. 2012) ("This construction of § 550(a)—virtually universal among courts that have substantively considered the issue—reflects § 550's underlying purpose of restoring the estate to its position prior to the transfer.").

67.    For the reasons discussed below, Plaintiffs have established that the perfection of Defendant's security interest pursuant to the UCC-1 financing statement filed by Defendant (the "Lien Transfer") constitutes an avoidable and therefore recoverable transfer.

a.    **The Lien Transfer Was a Transfer of Plaintiffs' Interest in Property to or for the Benefit of a Creditor.**

68.    The filing of the UCC-1 financing statement and purported perfection of the Vendor's security interest in the Consigned Goods constitutes a "transfer" of Plaintiffs' interest in property pursuant to section 101(54) of the Bankruptcy Code, which includes the creation of a lien.  11 U.S.C. § 101(54).  It is well established that the perfection of a security interest

constitutes a "transfer" within the meaning of section 547(b).  *See, e.g., In re Qualia Clinical Serv., Inc.,* 652 F.3d 933, 938 (8th Cir. 2011) (finding that "[t]he creation of a perfected security interest is itself a preference when the creation or perfection takes place during the preference period") (quoting *Braunstein v. Karger (In re Melon Produce, Inc.),* 976 F.2d 71, 74 (1st Cir. 1992) (internal quotation marks omitted); *In re Klingbeil,* 119 B.R. 178, 183 (Bankr. D. Minn. 1990) ("The perfection of a previously-attached lien or security interest is also a 'transfer' within the meaning of § 101(50) and within the contemplation of § 547(b)."); *In re Phillips,* 24 B.R. 712, 714-15 (Bankr. E.D. Cal. 1982) ("The perfection of a security interest is the transfer of property within the meaning of Section 547(b), to the benefit of a creditor, based on an antecedent debt (the sale two years earlier), that is made while the debtor is presumed insolvent (Section 547(f)), within 90 days of the filing of the petition (four days in this case), which would allow this plaintiff to take more as a secured creditor than as an unsecured creditor, since the debtor is insolvent.").

69.     Thus, the Lien Transfer here resulted in a transfer of the Plaintiffs' interests in property within the meaning of section 547(b) of the Bankruptcy Code.

70.     Moreover, the Lien Transfer was made to or for the benefit of a "creditor" within the meaning of section 101(10)(A) of the Bankruptcy Code.  Plaintiffs admit that as of the date of the Lien Transfer, Plaintiffs owed Defendant at least $20,567 on account of Consigned Goods that had already been sold.  *See* Statement of Facts ¶ 25.  Moreover, Defendant asserted a claim for return of goods in the amount of approximately $437,000 as of February 19, 2016 and $426,000 as of April 2, 2016.  *See* Statement of Facts ¶¶ 18, 26.

### b. The Lien Transfer Was Made for or on Account of an Antecedent Debt Owed by Plaintiffs Before the Lien Transfer Was Made.

71.     While the Bankruptcy Code does not define the term "antecedent debt," courts have found that a debt is antecedent for purposes of section 547(b) if it was incurred before the debtor made an allegedly preferential transfer.  A debt is deemed to have been incurred "on the date upon which the debtor first becomes legally bound to pay." *See, e.g., Stanziale v. S. Steel & Supply, L.L.C. (In re Conex Holdings, LLC)*, 518 B.R. 269, 277 (Bankr. D. Del. 2014) (citations omitted); *see also Collier on Bankruptcy* ¶ 547.03[4] (16th ed.) ("Although 'antecedent debt' is not defined by the [Bankruptcy] Code, a debt is 'antecedent' if it is incurred before the transfer: the debt must have preceded the transfer.").

72.     Here, the Lien Transfer was on account of an antecedent debt owed by Plaintiffs to Defendant before the Lien Transfer was made.  Defendant attached several invoices to the UCC-1 financing statement indicating that Plaintiffs owed various amount on account of goods delivered throughout 2015.  *See* Statement of Facts ¶ 23.  Plaintiffs admit that as of the date of the Lien Transfer, Plaintiffs owed Defendant at least $20,567 on account of Consigned Goods that had already been sold.  *See* Statement of Facts ¶ 25.  Moreover, Defendant asserted a demand claim for return of goods in the amount of approximately $437,000 as of February 19, 2016.  *See* Statement of Facts ¶ 18.  Thereafter, Defendant admitted in the April 2 Email that Defendant received a check from Plaintiffs in the amount of "roughly $11,400" and that Plaintiffs "still owe . . . $426,000 for what they have in their possession."  *See* Statement of Facts ¶ 26.

34

> **c.     The Lien Transfer Was Made While Plaintiffs Were Presumptively Insolvent Under Section 547(f) of the Bankruptcy Code.**

73.     Pursuant to section 547(f) of the Bankruptcy Code, a debtor is deemed to be insolvent 90 days prior to the date its bankruptcy case is commenced.  11 U.S.C. § 547(f).  Here, the Lien Transfer was made on March 1, 2016 – one day before the Petition Date – when Plaintiffs are deemed to have been insolvent.  *See* Statement of Facts ¶ 23.

> **d.     The Lien Transfer Was Made Within 90 Days Prior to the Petition Date.**

74.     Pursuant to the "perfection rule" set forth in section 547(e)(2) of the Bankruptcy Code, a transfer is made "at the time such transfer takes effect between the transferor and the transferee, if such transfer is perfected at, or within 30 days after, such time," or "at the time such transfer is perfected, if such transfer is perfected after such 30 days."  11 U.S.C. § 547(e)(2).  Thus, the perfection of a security interest arising from a transfer that occurred more than 30 days preceding such perfection is deemed to have occurred on the date of perfection.

75.     Here, the Lien Transfer was made on account of Consigned Goods and proceeds thereof that were shipped and delivered more than 30 days before Defendant filed the UCC-1 financing statement.  *See* Statement of Facts ¶ 23.   Defendant attached invoiced to its UCC-1 financing statement from 2015 and had not shipped or delivered any goods within 30 days of the date on which it filed the UCC-1 financing statement.  *See id.*  Therefore, as a matter of law, the Lien Transfer is deemed to have been made on March 1, 2016 – just one day before the Petition Date.

> **e.     The Lien Transfer Enables Defendant to Receive More Than It Would Receive in Plaintiffs' Chapter 7 Liquidation.**

76.     Absent the Lien Transfer, Defendant would have had only an unperfected security interest, vulnerable to avoidance and recovery by Plaintiffs (pursuant to sections 544 and 550 of

the Bankruptcy Code) and subordinate to perfected security interests (pursuant to UCC §§ 9-317, 9-322, and 9-324), and therefore subject to treatment as an unsecured claim holder.  Perfection of its security interest by the filing of the UCC-1 financing statement, however, eliminated such exposure and elevated the priority of Defendant's otherwise unsecured claim, enabling it to receive more than it would receive in a hypothetical liquidation for its otherwise unsecured claim.

77.    "Whether a transfer meets the test of section 547(b)(5) requires the formulation of a hypothetical chapter 7 distribution of a debtor's estate as it existed on the petition date." *In re AFA Inv. Inc.,* No. 12-11127, 2016 WL 908212, at *2-3 (Bankr. D. Del. Mar. 9, 2016) (citations omitted).  *See also In re Vaso Active Pharm., Inc.,* 500 B.R. 384, 394-95 (Bankr. D. Del. 2013), *aff'd*, 537 B.R. 182 (D. Del. 2015) (citations omitted) ("The Supreme Court has held that whether a particular transfer is preferential should be determined 'not by what the situation would have been if the debtor's assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but by the actual effect of the payment as determined when bankruptcy results.'")  "[A]s long as the [hypothetical] distribution pays less than one-hundred percent to unsecured creditors, § 547(b)(5) is satisfied." *In re AFA Inv. Inc.,* 2016 WL 908212, at *2-3 (citing *In re Total Tech. Serv., Inc.,* 150 B.R. 893 (Bankr. D. Del. 1993)); *see also In re Vaso*, 500 B.R. at 394-95 ("The net result is that, as long as the distribution in bankruptcy is less than one-hundred percent, any payment "on account" to an unsecured creditor during the preference period will enable that creditor to receive more than he would have received in liquidation had the payment not been made."); *Tire Kings of Am., Inc. v. Hoffman Tire Co. (In re Tire Kings of Am., Inc.),* 164 B.R. 40 (Bankr. M.D. Pa. 1993) (finding

that the plaintiff satisfied section 547(b)(5) simply because the liabilities listed in the petition were greater than its assets).

78.    For example, in *In re AFA*, this Court held that the declaration of the debtors' chief restructuring officer was "sufficient to establish that the Defendant would receive less than a 100% recovery in a hypothetical chapter 7 liquidation." 2016 WL 908212, at *2-3. Similarly, in *In re Vaso*, the court took judicial notice of the documents in the debtors' bankruptcy case as a whole and concluded that "there can be no dispute that this case will not return one hundred percent to unsecured creditors." 500 B.R. at 394-95. The court further explained that "[a]s a matter of general arithmetic, any transfer to a general unsecured creditor ordinarily satisfies this test unless the debtor's estate turns out to be solvent in Chapter 7." *Id.* at 395.

79.    Here, the schedules filed by TSA demonstrate that, as of the Petition Date, TSA's liabilities exceeded its assets. *See Schedules of Assets and Liabilities for TSA Stores, Inc.* [Dkt. No. 1360]. Specifically, the schedules illustrated that, of the Petition Date, TSA held approximately $1.38 billion in assets and had liabilities in the amount of approximately $1.46 billion in liabilities. *See id.* Therefore, as of the Petition Date, TSA and its debtor affiliates would be unable to satisfy in full all unsecured claims in a hypothetical liquidation.

80.    Moreover, Plaintiffs' financial advisor has projected that TSA's unsecured creditors will not be able to recover 100 percent of the value of their claims. *See* Statement of Facts ¶ 27. Furthermore, this Court was sufficiently concerned about Plaintiffs' administrative insolvency that the Court refused to grant Plaintiffs' secured lenders a waiver of potential claims under section 506(c) of the Bankruptcy Code. *See Final Order (I) Authorizing Debtors to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, And 364; (II) Granting Liens and Superpriority Claims to Post-Petition Lenders Pursuant to 11 U.S.C. §§ 364*

*and 507; and (III) Authorizing the use of Cash Collateral and Providing Adequate Protection to*

*Prepetition Secured Lenders and Modifying the Automatic Stay Pursuant to 11 U.S.C. §§ 361,*

*362, 363, and 364* [D.I. 1699].

81.     The Lien Transfer falls squarely within the foregoing authorities.  As a result of

the Lien Transfer, Defendant stands to receive a greater recovery than would otherwise be

allocable to Defendant's unsecured claim.  Thus, the Lien Transfer should therefore be avoided

and recovered as a preference under sections 547(b) and 550 of the Bankruptcy Code.

> **2.      *Upon Avoidance and Recovery Under Sections 547 and 550,
> Defendant's Unperfected Security Interest Is Avoidable and Recoverable
> Under Sections 544(a) and 550 of the Bankruptcy Code Rendering the
> Consigned Goods Property of Plaintiffs' Estates.***

82.     For the reasons discussed above, Plaintiffs are entitled to avoid the Lien Transfer

pursuant to which Defendant sought to perfect its security interest one day before the Petition

Date.  As a consequence of such avoidance and recovery of the Lien Transfer pursuant to

sections 547 and 550 of the Bankruptcy Code, Defendant will hold, by operation of law, only an

unperfected security interest.  Defendant's unperfected security interest is avoidable and

recoverable by Plaintiffs pursuant to sections 544(a) and 550 of the Bankruptcy Code.

83.     The unperfected security interest that Defendant may have, by operation of law, in

the Consigned Goods is fatal under the Bankruptcy Code, because Plaintiffs are armed with the

right to avoid any liens or interest which are junior to a hypothetical lien creditor as of the

Petition Date.  Pursuant to section 1107(a), Plaintiffs have the rights and powers of a trustee, and

pursuant to section 544(a)(1), a trustee has the rights and powers of a judicial lien creditor.

Pursuant to UCC § 9-317(a)(2)(A), a security interest is subordinate to the rights of "a person

that becomes a lien creditor before the earlier of the time . . . the security interest . . . is

perfected."  Accordingly, Plaintiffs, in the shoes of a judicial lien creditors, can avoid

Defendant's unperfected security interest.  Importantly, pursuant to section 544(a), the knowledge of the prepetition debtors are not imputed to Plaintiffs.  11 U.S.C. § 544(a)(1); *see also In re Valley Media*, 279 B.R. at 132 (holding that the rights of the debtors under section 544 trumped the rights of the vendors and that "the Objecting Vendors may not assert ownership rights in the Contested Inventory against the Debtor in Possession as a hypothetical lien creditor of [the debtor] pursuant to 11 U.S.C. §§ 544(a) & 1107(a)"); *see also In re Tristar Automotive Group, Inc.,* 141 B.R. 41 (Bankr. S.D.N.Y. 1992) (holding that because the consignor had not filed a financing statement and offered no proof that debtor was substantially engaged in selling cars of others, consignor had only a general unsecured claim and was no more entitled to relief from stay than any other unsecured general creditor).  In fact, Defendant admits in the Motion that judicial lien creditors have superior rights to the consigned goods of consignors who failed to perfect their security interests.

84.    Accordingly, upon avoidance and recovery under sections 547(a) and 550 of the Bankruptcy Code, Defendant's unperfected security interest should be entirely avoided and recovered under sections 544(a) and 550 of the Bankruptcy Code.  Consequently, the Consigned Goods should be deemed property of Plaintiffs' estates within the meaning of section 541(a) of the Bankruptcy Code and unencumbered by any interest of Defendant.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court (i) deny the

Defendant's Motion, (ii) grant Plaintiffs' Cross-Motion, and (iii) grant such other and further

relief as is just and necessary.

Dated:  May 16, 2016                        YOUNG CONAWAY STARGATT & TAYLOR, LLP

Wilmington, Delaware                    /s/ Michael S. Neiburg                                   
                                        Michael R. Nestor (No. 3526)
                                        Michael S. Neiburg (No. 5275)
                                        Andrew L. Magaziner (No. 5426)
                                        Rodney Square
                                        1000 North King Street
                                        Wilmington, DE 19801
                                        Telephone: (302) 571-6600

                                        -and-

                                        GIBSON, DUNN & CRUTCHER LLP
                                        Robert A. Klyman
                                        David A. Battaglia
                                        Sabina Jacobs
                                        333 South Grand Avenue
                                        Los Angeles, CA 90071
                                        Telephone: (213) 229-7000

                                        *Counsel for Plaintiffs*